UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT BOWLING GREEN

DONALD R. IRVIN
    Plaintiff

v.                                                                                                                                                                                                            No. 1:07CV-00061-J

MICHAEL J. ASTRUE
    Commissioner of Social Security
    Defendant

**MAGISTRATE JUDGE'S REPORT**
**and RECOMMENDATION**

This matter is before the court upon the plaintiff's complaint seeking judicial review of the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g). The plaintiff is represented by Leonard Brashear. The fact and law summaries of the plaintiff and the defendant are at Docket Entry Nos. 10 and 11, respectively. This matter has been referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636.

The final decision of the Commissioner was rendered on August 1, 2006, by administrative law judge (ALJ) Ronald Kayser. In support of his decision denying Title II and Title XVI benefits, Judge Kayser entered the following numbered findings:

    1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

    2. The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

    3. The claimant has the following severe impairment: back and leg pain (20 CFR 404.1520(c) and 416.920(c)).

    4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently or light exertional work. He can stand and walk six hours in an eight hour workday, sit six hours in an eight hour workday with a sit/stand option. He can push and pull 20 pounds, occasionally bend, crouch and kneel. He must avoid crawl, climb ropes, scaffolds and ladders, frequently climb ramp and stairs. He must avoid working on slippery wet and uneven surfaces, balancing and all vibration.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on July 14, 1955 and was 48 years old on the alleged disability onset date, which is defined as a younger individual 45-49 (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability due to the claimant's age (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. The claimant has not been under a "disability," as defined in the Social Security Act, from March 5, 2004 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Administrative Record (AR), pp. 18-23).

## Governing Legal Standards

1. The court has jurisdiction to examine the record that was before the Commissioner on the date of the Commissioner's final decision and to enter a judgment affirming, modifying, or reversing that decision. 42 U.S.C. § 405(g), sentence four. In exercising its "sentence four" jurisdiction, the court is limited to determining whether the Commissioner's controlling findings are supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching her decision. *Richardson v. Perales*, 402 U.S. 389 (1971). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Kirk v. Secretary*, 667 F.2d 524 (6th Cir., 1981). It has been described as a sufficient amount of evidence "to justify, if the trial were to a jury, a refusal to direct a verdict." *Sias v. Secretary*, 861 F.2d 475, 480 n. 1 (6th Cir., 1988). In determining whether the Commissioner's findings are supported by substantial evidence, the court must examine the evidence in the record taken as a whole and must take into account whatever in the record fairly detracts from its weight. *Wyatt v. Secretary*, 974 F.2d 680 (6th Cir., 1992). However:

> The substantial-evidence standard allows considerable latitude to administration decision makers. It presupposes that there is a zone of choice within which the decision makers can go either way, without interferences by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.

*Mullen v. Secretary*, 800 F.2d 535, 545 (6th Cir., 1986).

When conducting substantial evidence review, the court is restricted to a consideration of the evidence that was before the Commissioner on the date of the final decision. When the Appeals Council declines to review the ALJ's decision and render a new decision, the ALJ's decision becomes the Commissioner's final decision. *Cotton v. Secretary*, 2 F.3d 692 (6th Cir., 1993).

2. To be entitled to disability insurance benefits (DIB), a claimant must be under the age of 65 years, must meet the insured status requirements of Title II of the Social Security Act, and must be under a disability as defined by the Act. To qualify for supplemental security income (SSI) benefits, a claimant must file a Title XVI application, must have insufficient earnings and other financial resources, and must be under a disability as defined by the Act. The determination of disability is essentially the same for Title II and Title XVI purposes.

3. Disability determination is a five-step sequential evaluation process, to-wit:

**STEP #1** The claimant must not be engaged in substantial gainful activity.

**STEP #2** The alleged disabling impairment must be "severe." A "severe" impairment is one that "significantly limits" a claimant's ability to do "basic work activities" that are "necessary to do most jobs" such as walking, standing, sitting, lifting, seeing, hearing, and speaking. 20 C.F.R. §§ 404.1521 and 416.921. Only a "slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education and work experience" is "nonsevere." *Farris v. Secretary*, 773 F.2d 85, 89-90 (6th Cir., 1985). Any physical or mental impairment that has more than a de minimis, or significant, effect on the claimant's ability to work is "severe," and the sequential evaluation should proceed to Step #3. In addition, the "severe" impairment must satisfy the so-called duration requirement, to-wit, the impairment must be expected to result in death or "must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. §§ 404.1509 and 416.909.

**STEP #3** If the claimant has a medical condition that meets or exceeds the criteria for an impairment defined in Appendix 1 of 20 C.F.R. Part 404, Subpart P of the regulations ("the Listing"), a conclusive presumption attaches that the claimant is disabled.

**STEP #4** The claimant must not be able to perform his past relevant work either as he actually performed it or as it generally performed in the national economy.

**STEP #5** If the claimant makes a prima facie showing that he cannot perform his past relevant work, the burden of going forward with evidence shifts to the Commissioner to show that a significant number of jobs exist in the national economy that the claimant can perform. *Born v. Secretary*, 923 F.2d 1168 (6th Cir., 1990). The focus of judicial review in Step #5 cases is typically whether the controlling hypothetical posed to the vocational expert reflected all vocationally significant physical and mental limitations actually suffered by the claimant. *Varley v. Secretary*, 820 F.2d 777 (6th Cir., 1987).

### The plaintiff's medical condition

The plaintiff was born on July 14, 1955. His last job was at Cumberland Truss building roof trusses. The job required him to assist in moving trusses weighing up to 400 pounds. The plaintiff alleges that on March 5, 2004, at 48 years of age, while moving a truss, he developed disabling low back pain radiating into his left lower extremity (AR, pp. 120 and 301). On or about July 27, 2004, he was evaluated at the request of his employer's worker's compensation insurance carrier by Timothy Kriss, M.D. Dr. Kriss discounted many of the plaintiff's complaints but nevertheless assessed a whole person impairment of six percent. The plaintiff was awarded temporary total disability payments (AR, pp. 128 and 310). The magistrate judge is unaware of whether the plaintiff eventually received permanent worker's compensation benefits.

The plaintiff's primary treating source is Rockie McDaniel. Mr. McDaniel is an advanced registered nurse practitioner (ARNP) who is associated with the McDaniel Family Medical Center in Columbia, Kentucky. On March 22, 2004, upon referral by Mr. McDaniel, an MRI was obtained of the plaintiff's lumbar spine at Lifescan Columbia. The MRI was interpreted by a radiologist,

Brooks Horsley, M.D., as revealing a "left sided disk protrusion at the L2, 3 level which causes mild displacement and compression of the left L3 nerve root" and a "small right paramedian disk protrusion at the L4, 5 level which indents the thecal sac. I doubt this is compressing the right L5 nerve root but correlation is needed" (AR, p. 123). On October 14, 2004, Mr. McDaniel completed the standard Physical Residual Functional Capacity Questionnaire in a manner that would preclude even "sedentary" work if accepted in its totality and would require an ultimate finding of disability (AR, pp. 177-181 and 296).

On April 13, 2005, the plaintiff was referred for consultation and evaluation with Phillip Tibbs, M.D. Dr. Tibbs is a professor of neurosurgery and rehabilitation medicine and is the director of the Spine Center of the University of Kentucky. Like Mr. McDaniel, Dr. Tibbs described the plaintiff's limitations as precluding even "sedentary" work, to-wit (AR, p. 235):

> [The plaintiff] has developed shooting, radicular left leg pain that started soon after his incident. The pain is intermittent and still present and related to position or activity. The pain radiates into the posterior portion of his thigh extending into his foot. He has no numbness, tingling or weakness in the left leg. Overall, the pain is exacerbated with standing, sitting or walking for long periods of time. He feels that his back pain is currently worse than the leg pain.

Dr. Tibbs advised the plaintiff that he may be a candidate for a posterior lumbar interbody fusion depending upon the results of an updated MRI and discogram study (AR, p. 236).

On May 20, 2005, upon referral by Dr. Tibbs, the plaintiff underwent a lumbar discogram. The discogram was administered and interpreted by Curtis Given, M.D., who is associated with the Department of Diagnostic Radiology of the University of Kentucky Chandler Medical Center.

According to www.spine-health.com:

> [A] discogram is a test to determine the anatomical source of low back pain for the patient. This procedure is most frequently used to determine if degenerative disc disease is the cause of a patient's pain (discogenic low back pain). Discograms are also performed to assist in preoperative planning for candidates for a lumbar spinal fusion.
>
> In this procedure, the discographer inserts a needle in the patient's back into the center of the disc. Radiographic dye is then injected into the disc, and if injecting the dye recreates the patient's normal pain (concordant), it is then inferred that the specific disc is the source of pain for the patient. If the pain is unlike their normal pain (discordant) it can be inferred that even though the disc may look degenerated on an MRI scan, it is in fact not the source of the patient's pain. The test itself is painful, but the patient needs to be awake and aware in order to tell the discographer what kind of pain is generated by the injection. ... Often, after the discogram is completed, a CT scan is performed to check the morphology (anatomy) of the disc.
>
> *(The foregoing general information is provided for the court's convenience for the limited purpose of facilitating an understanding of the nature of the testing which the plaintiff underwent. The magistrate judge has drawn no legal or factual conclusion therefrom pertinent to the present judicial review of the Commissioner's final decision.)*

Dr. Given interpreted the discogram results as follows (AR, p. 230):

> Conclusion: Successful L2/3 through L5/S1 discograms as detailed above. While the patient complained of pain at multiple levels, the pain was most similar to his baseline/similar pain during the L4/5 disc injection. The L4/5 disc is markedly degenerated with contrast leakage into the anterior epidural space consistent with at least an annular tear.

On May 25, 2005, in conjunction with the discogram, Dr. Tibbs obtained an updated MRI of the lumbar spine (AR, p. 228). On that same date, Dr. Tibbs performed a thorough physical examination of the plaintiff, and in light of the discogram results, the updated MRI, and the medical evidence as a whole, Dr. Tibbs concluded that the plaintiff has "multiple levels of degenerative disc disease and we discussed the option of a posterior lumbar interbody fusion but he has so many levels involved, it would be impractical so we are referring him for pain clinic evaluation" (AR, p. 226).

7

On August 31, 2005, Dr. Tibbs referred the plaintiff to a pain management specialist Howard Lynd, M.D.(AR, p. 225).

In a "to whom it may concern" letter dated March 21, 2006, Dr. Tibbs opined as follows (AR, p. 260):

> I had evaluated Mr. Donald Irvin for symptoms of incapacitating back, hip, and leg pain in the past. I examined him in detail and found that he has reduced range of motion in the spine and a positive straight leg raising test on the left. I carefully reviewed the patient's objective radiographic studies including his MRI scan and his discogram.
>
> Mr. Irvin is symptomatic from severe lumbar degenerative disc disease at multiple levels throughout the entire spine. Associated with this degenerative disc disease, he has collapse of multiple disc spaces and osteoarthritis of the lumbar facet joints. The inflammatory condition in these arthritic facet joints can trigger episodes of sciatica. I carefully considered whether the patient's condition was amenable to surgical intervention and found that it is so extensive at so many levels that he is not a candidate for lumbar fusion procedure. It was my conclusion that Mr. Irvin must be considered disabled from all work activities for which he is qualified by training or experience. The patient's symptoms are consistent with the objective radiographic studies, which demonstrate severity of degenerative joint disease that would clearly be a causative of incapacitating pain.

On March 27, 2006, the plaintiff's pain management specialist, Dr. Lynd, stated his agreement with the limitations previously assessed by Mr. McDaniel, to-wit (AR, p. 259):

> I have been treating Donald Irvin, on referral from Dr. Phillip Tibbs. I have reviewed the Physical Residual Functional Capacity Questionnaire of Rockie McDaniel, ARNP, McDaniel Family Medical Center dated October 14, 2004. I agree with the limitations set out therein as of this date.
>
> MRI of the lumbar spine has confirmed an L3 nerve root impingement and there is a further indication of possible compression at L4-5.

On March 7, 2006, another treating source, Phil Aaron, M.D., completed the standard Physical Capacities Evaluation (AR, p. 247). Like Mr. McDaniel and Dr. Lynd, Dr. Aaron assigned limitations that would preclude even "sedentary" work.

8

In sum, all the treating and examining sources, Mr. McDaniel and Drs. Tibbs, Lynd, and Aaron were of the opinion that the plaintiff's physical impairments render him unable to sustain work activity because he is unable to sit and/or stand for an eight-hour workday and his low back pain and shooting radicular left leg pain extending into his foot are exacerbated with prolonged standing, sitting, or walking.

## Discussion

At the supplemental administrative hearing held on April 25, 2006, the ALJ secured testimony from a medical advisor, Arthur Lorber, M.D. Dr. Lorber is a retired orthopedic surgeon (AR, p. 122). Dr. Lorber testified that he "took exception" to the level of severity assessed by Dr. Tibbs in his letter of March 21, 2006, and opined that the plaintiff is capable of performing a limited range of "light" work (AR, p. 287). Dr. Lorber also indicated his disagreement with the assessments of the treating sources, Drs. Lynd and Aaron, to the extent they would preclude "light" and "sedentary" work (AR, p. 288).

In his written decision, the ALJ found that Dr. Lorber is "well-qualified to render an opinion as to physical aspects of the claimant's condition, his opinion is strongly supported by the evidence from treating sources and the Administrative Law Judge finds his testimony was persuasive and was supported by the record" (AR, p. 21). The plaintiff's primary contention upon judicial review is that the ALJ erred in relying upon opinion of the nonexamining medical advisor, Dr. Lorber, in preference to those of his treating and examining sources, Mr. McDaniel and Drs. Tibbs, Lynd, and Aaron.

The magistrate judge concludes that the plaintiff's argument is persuasive if Dr. Lorber's testimony in support of his rejection of the foregoing medical source opinions is unpersuasive. For the reasons set forth below, the undersigned concludes that the evidence fails to support the ALJ's finding that Dr. Lorber's testimony is "persuasive" and "strongly supported" by the treatment records.

Dr. Lorber cited the following reasons in support of his rejection of the treating source medical opinions, which we shall consider in turn:

1. The first MRI was taken in March of 2004, at Lifescan Columbia (AR, p. 123). The second one was taken in May of 2005, at the University of Kentucky Medical Center (AR, p. 228). According to Dr. Lorber, the second MRI is more reliable because "I don't know where [Lifescan Columbia] is or the quality of that institution" (AR, p. 287).

The magistrate judge concludes that Dr. Lorber's unfamiliarity with the Lifescan facility does not provide a substantial basis for completely discounting the MRI which was taken at that facility and interpreted by a qualified radiologist, Dr. Horsley.

2. Dr. Lorber testified that "there is no evidence of disc herniation on MRI except for the first one, which is contradicted by the second one" (AR, p. 290). The second MRI "spoke very clearly ... that there was no evidence of a disc herniation," it revealed "nothing more than mild disc bulges with no evidence of disc herniation," and it "would not suggest that there was a severe problem frankly" (AR, pp. 287 and 291).

The magistrate judge concludes that the Lifescan MRI makes no reference to a "herniation" (AR, p. 123). It merely notes the presence of multiple disc "protrusions" (AR, p. 123). The University of Kentucky MRI also makes no reference to a "herniation." Whereas the Lifescan MRI references disc "protrusions", the University of Kentucky MRI mentions disc "bulges" and an

"annular tear or radial fissure ... at the level of L5-S1" (AR, p. 228). Dr. Tibbs, who was well-aware of the prior MRI results, indicated no surprise or inconsistency upon obtaining the results of the subsequent MRI (AR, p. 235). Thus, contrary to Dr. Lorber's testimony, that there is no genuine discrepancy or inconsistency between the two MRI's. Furthermore, there appears to be nothing in the University of Kentucky MRI that "contradicts" the Lifescan MRI.

The MRI and discogram were ordered concurrently by Dr. Tibbs in May of 2005, for purposes of determining whether a lumbar fusion was appropriate. They were intended to be interpreted in conjunction with each other. The MRI was taken "without contrast," whereas the discogram included "bi-plane fluoroscopic images ... at each level." As indicated above, the MRI revealed an "annular tear or radial fissure ... at the level of L5-S1" (AR, p. 228). The discogram, in turn, revealed a "contrast extravasation from the right lateral aspects of the disc into the right L2-3 neuroforamen ... consistent with at least an annular tear" (AR, p. 229). The magistrate judge concludes, contrary to Dr. Lorber's testimony, that the presence of two annular tears, one of which has "contrast extravasation ... into the right L2-3 neuroforamen," does not "speak very clearly ... that there was no evidence of a disc herniation." In any event, the results of the University of Kentucky studies as a whole cannot fairly be regarded as evidencing no "severe problem," and Dr. Lorber's conclusion cannot be considered to be persuasive in light of that clinical evidence.

3. Although Dr. Lorber acknowledged that Dr. Tibbs found the discogram results to be convincing, Dr. Lorber testified that the results were, in fact, "invalid." By way of explanation of his rejection the interpretation of the clinical data as a whole by Dr. Tibbs, Dr. Lorber speculated that Dr. Tibbs may have had "some difficulty distancing himself from that procedure on an objective basis" (AR, p. 292). According to Dr. Lorber, the discogram results were invalid for the following reasons (AR, p. 293):

11

> [T]he interpretation of a discogram at multiple levels where there is 10 out of 10 concordant pain or non-concordant pain at each and every level makes it in my judgment and I believe ... the literature will verify that ... makes it an invalid test. You can't interpret anything when each and every level is responding at a very high level. You have to have some differentiation between one disc and another. You have to have what's called a controlled disc. If you don't have a controlled disc with a low response to pain, then the patient's responses are invalid in my judgment.

The magistrate judge concludes that Dr. Lorber identified no evidentiary basis for his suggestion that Dr. Tibbs may have experienced "some difficulty distancing himself from that procedure on an objective basis." In any event, there is no indication that the individual who actually administered and interpreted the discogram as showing significant clinical findings, Dr. Given, was infected by a lack of objectivity. Furthermore, contrary to Dr. Lorber's assertion, the discogram did not reveal "10 out of 10 concordant pain or non-concordant pain at each and every level." It revealed 7 out of 10 concordant pain at the L2/L3 level and reports of 10 out of 10 concordant pain at the L3-L4 and L5-S1 levels, which Dr. Givens discounted because he felt they were "secondary to irritation of the adjacent nerve [and hence] not the patient's baseline/presenting pain" (AR, p. 229). Dr. Given found that the plaintiff's valid "baseline/presenting pain" was at the L4-L5 level. The magistrate judge concludes that, while Dr. Lorber may have correctly stated a general rule that one cannot have valid high readings of concordant pain at each and every level, a careful inspection of Dr. Given's findings and procedures as a whole fails to reveal a convincing basis for concluding that the rule was violated in connection with Dr. Given's interpretation of the plaintiff's discogram.

4. Dr. Lorber testified that "Dr. Kriss on 27 July '04 found that ... the patient's complaint of pain did not correlate with the MRI findings [from the first MRI]. The patient's complaint of pain would have been expected to have been in an L3 dermatomal pattern, but his complaints were found by Dr. Kriss to be in an L5 or S1 nerve root distribution" (AR, p. 283).

On or about July 27, 2004, the plaintiff was evaluated at the request of his employer's worker's compensation insurance carrier by Timothy Kriss, M.D. Dr. Kriss based his findings upon the results of the first MRI inasmuch as the second one had not yet been obtained. As noted in numbered paragraphs 1 and 2, above, one of Dr. Lorber's central assertions apparently was that the second MRI was "more reliable" and "contradicted" the first one. Therefore, as a preliminary observation, it appears selective and internally inconsistent of Dr. Lorber to have rejected the MRI results to the extent they tended to establish the plaintiff's claim but then to rely upon those same results for purposes of undermining his claim.

In any event, the magistrate judge concludes that Dr. Kriss' concerns with respect to an incorrect dermatomal pain pattern appear to be adequately explained and obviated by the results of the subsequent MRI, which was not before Dr. Kriss. Because the first MRI revealed an abnormality at the L2-L3 level, only a "small right" abnormality at the L4-L5 level, and no abnormality at the L5-S1 level, Dr. Kriss could not reconcile the plaintiff's exhibited "left radicular leg pain [that] follows an L5 or S1 distribution" (AR, pp. 123 and 128). However, the second MRI revealed an "annular tear or radial fissure ... at the level of L5-S1" (AR, p. 228). The latter finding appears to be consistent with and supportive of the L5-S1 dermatomal pain pattern previously observed by Dr. Kriss.

5. According to Dr. Lorber, "each and every examiner has found this patient to be neurologically intact without evidence of focal neurologic deficit" (AR, p. 287). "Dr. Kriss on 27 July '04 found that the clinical examination revealed no evidence of focal neurologic deficit" (AR, p. 283). "Dr. Tibbs on 13 April '05 found no evidence of neurologic deficit. Dr. Lynd found on 14 June '05 no evidence of focal neurologic deficit" (AR, p. 291).

13

The magistrate judge has carefully inspected the examination results of the physicians mentioned by Dr. Lorber. See assessments of Drs. Kriss, Tibbs, and Lynd at AR, pp. 126-130, 235-236, and 221-223, respectively. Because there is no mention of a "focal neurological deficit" in these records, the undersigned concludes that Dr. Lorber's assertion that these physicians found no focal neurological deficit was not so much a fact but rather Dr. Lorber's own medical conclusion.

A focal neurological deficit consists of a set of symptoms or signs in which causation can be localized to an anatomic site in the central nervous system, for example, loss of movement or sensation of the left leg. See MedlinePlus Medical Encyclopedia at www.nlm.nih.gov (National Library of Medicine, National Institutes of Health). In his "to whom it may concern" letter dated March 21, 2006, Dr. Tibbs opined that the plaintiff's observed limited range of motion and positive straight leg on raising on the left side "are consistent with the objective radiographic studies, which demonstrate severity of degenerative joint disease that would clearly be a causative of incapacitating pain" and "can trigger episodes of sciatica" (AR, p. 260). Similarly, Dr. Lynd associated observed hyperalgesia (i.e., extreme sensitivity to pain) of the lumbar paraspinous musculature and positive SLR on the left with the MRI results, which confirmed an L3 nerve root impingement and possible compression at the L4-L5 level (AR, pp. 222 and 259). The magistrate judge concludes that the weight of the evidence suggests that, if asked, Drs. Tibbs and Lynd likely would have opined that a focal neurological deficit is present. The opinion of the one-time examining source, Dr. Kriss, on the issue of whether there is an adequate anatomical basis for the plaintiff's reported limitations and observed pain distribution (i.e., whether a focal neurological deficit is present) is entitled to little weight because, as indicated in numerical paragraph 5, supra, Dr. Kriss did not have the benefit of the results of the second MRI and discogram study which revealed the L5-S1 involvement.

6. Dr. Lorber testified that the medical records reflect that "on 14 July '05 Dr. Lynd performed a lumbar epidural steroid injection on the claimant, which resulted in a 60 percent improvement in the patient's symptoms for ... a period of two weeks. There's no evidence in the record that lumbar epidural steroid injection was repeated and that's rather peculiar because if one got such a good response to the first epidural ... the usual and customary treatment is a series of three injections" (AR, p. 285).

The magistrate judge concludes that Dr. Lynd's medical records reflect that the plaintiff was administered a lumbar epidural steroid injection on July 28, 2005, (AR, p. 215). Therefore, Dr. Lorber was mistaken in asserting that "[t]here's no evidence in the record that lumbar epidural steroid injection was repeated" after July 15, 2005. In any event, the treating pain management specialist, Dr. Lynd, was in a better position than Dr. Lorber, who merely examined the record, to recognize any genuine "peculiarities" in the plaintiff's behavior. Dr. Lynd noted no such behavior and, in fact, was fully supportive of the plaintiff's disability claim. Dr. Lynd opined that the plaintiff's limitations were accurately stated in Mr. McDaniel's assessment (AR, p. 259).

7. Finally, Dr. Lorber testified that Dr. Tibbs' findings were unworthy of acceptance because "there are many individuals age 50 who have multi-level degenerative disc disease without herniations who function on the ["light"] level that I have described" (AR, p. 290). The magistrate judge concludes that Dr. Lorber's general observation does not provide a substantial basis for discounting the treating and examining source medical opinions, which concur that the plaintiff is unable to sustain "light" and/or "sedentary" work.

15

**The appropriate remedy**

At the supplemental hearing, the vocational expert testified that the limitations assigned by Mr. McDaniel and adopted by Dr. Lynd would preclude even "sedentary" work and render the plaintiff disabled (AR, p. 296). The magistrate judge concludes that Dr. Aaron's assessment's also would preclude "sedentary" work because it allows for only one hour of sitting in an eight-hour period (AR, p. 247). Dr. Tibbs did not provide a specific estimate of the plaintiff's capacity to sit in an eight-hour period. However, he did opine that the plaintiff's "collapse of multiple disc spaces [and] inflammatory condition of these arthritic facet joints" "would clearly be a causative of incapacitating pain" and "episodes of sciatica" and would render him "disabled from all work activities" (AR, p. 260). The magistrate judge concludes that Dr. Tibbs' findings are consistent with and tend to confirm the assessments of the treating sources, Drs. Lynd and Aaron, that the plaintiff cannot perform even "sedentary" work.

As indicated above, Dr. Lorber identified seven reasons for his rejection of the opinions of the treating sources. Dr. Lorber then gave his own assessment of the plaintiff's residual functional capacity, which allowed for a limited range of "light" work. The controlling vocational hypothetical was premised upon the limitations assigned by Dr. Lorber. In his written decision, the ALJ found that Dr. Lorber is "well-qualified to render an opinion as to physical aspects of the claimant's condition, his opinion is strongly supported by the evidence from treating sources and the Administrative Law Judge finds his testimony was persuasive and was supported by the record" (AR, p. 21). For the reasons indicated above, the magistrate judge concludes that Dr. Lorber's rationale for rejection of the treating and examining source opinions was unpersuasive. Therefore, the ALJ's decision is not supported by substantial evidence.

"If a court determines that substantial evidence does not support the [ALJ's] decision, the court can reverse the decision and immediately award benefits only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir., 1994). The opinion of a treating source is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2). In addition, "the opinion of a nonexamining physician [i.e., Dr. Lorber] is entitled to little weight if it is contrary to the opinion of the claimant's treating physician [i.e., Drs. Aaron and Lynd]." *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir., 1987). In light of the foregoing regulatory and case law standards for weighing medical opinions, the magistrate judge concludes that the record adequately establishes that the plaintiff is unable to perform even "sedentary" work and is therefore disabled.

## RECOMMENDATION

The magistrate judge RECOMMENDS that this matter be REMANDED to the Commissioner for calculation and payment of past-due Title II and/or Title XVI benefits based upon the plaintiff's applications filed on October 13, 2004, and his alleged onset of disability date of March 5, 2004.

**NOTICE**

Pursuant to 28 U.S.C. § 636(b)(1), any party shall have a period of ten (10) days, excluding intervening Saturdays, Sundays, and/or legal holidays pursuant to Fed.R.Civ.P. 6(a), from the date of notice of electronic filing within which to file written objections to the foregoing report with the Clerk of the Court. Further and pursuant to Fed.R.Civ.P. 72(b), any party may file a response to objections filed by another party within ten (10) days, excluding Saturdays, Sundays, and/or intervening legal holidays, after being served with a copy of said objections. A period of three days shall be added to each ten (10) day period above pursuant to Fed.R.Civ.P. 6(e).

The court shall not conduct a de novo review of objections that are general, conclusory, or merely adopt previous pleadings. The original objections shall be sent to the Clerk of Court either electronically or by mail. A copy of any objections and response thereto shall be served on the undersigned at Suite 330, 501 Broadway, Paducah, Kentucky, 42001 or via e-mail to w_david_king@kywd.uscourts.gov. Failure of a party to file timely objections shall constitute a waiver of the right to appeal by that party. *Thomas v. Arn*, 474 U.S. 140 (1985).